UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| HEATHER A. DADY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    CAUSE NO. 1:21-cv-00018-SLC |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Heather A. Dady appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I.  FACTUAL AND PROCEDURAL HISTORY

Dady applied for DIB and SSI in November 2017, alleging disability as of November 8, 2017.[1] (ECF 16 Administrative Record ("AR") 15, 232-44). Dady's claim was denied initially and upon reconsideration. (AR 112-13, 144-45). On November 6, 2019, administrative law judge ("ALJ") Genevieve Adamo conducted an administrative hearing at which Dady, who was represented at the hearing by Tara Budd, "a non-attorney and secondary representative" (AR

---

[1] Regardless of a claimant's claimed onset date, SSI is not payable until the month following the month in which a claimant files her SSI application. *See* 20 C.F.R. § 416.335. Therefore, the first month Dady could be eligible to receive SSI is December 2017, given that she applied for SSI in November 2017.

15);[2] Dady's domestic partner; and a vocational expert ("VE") testified. (AR 34-58). On February 5, 2020, the ALJ rendered an unfavorable decision to Dady, concluding that she was not disabled because despite the limitations caused by her impairments she could perform her past relevant light-exertional work as a gas station cashier and prep cook, as well as a significant number of other unskilled jobs in the national economy. (AR 15-27). The Appeals Council denied Dady's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Dady filed a complaint with this Court on January 15, 2021, seeking relief from the Commissioner's decision. (ECF 1). In her opening brief, Dady argues that: (1) the ALJ inappropriately used her lack of therapy, presumed irregular use of medication, and tobacco habits when assessing the credibilty of her symptom testimony; and (2) the ALJ failed to account for all of her physical and mental limitations when assigning the residual functional capacity ("RFC"). (ECF 18 at 9).

At the time of the ALJ's decision, Dady was forty-two years old (AR 232), had a high school education (AR 277), and had past relevant work experience as a gas station cashier and a prep cook (AR 24; *see also* AR 264). In her application, Dady alleged disability due to a brain aneurism, mass above her right eye, dizziness, reduced mobility, anxiety, incontinence, and difficulty with "thought processing and speaking." (AR 276).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and

---

[2] Dady's primary representative during the administrative proceedings was Attorney Randall Forbes, who also represents her in this litigation. (AR 220; ECF 2).

transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB or SSI must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. §§ 416(i)(1),

423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing any work in the national economy.[3] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The Commissioner's Final Decision

On February 5, 2020, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 15-27). At step one, the ALJ concluded that Dady had not engaged in substantial gainful activity since November 8, 2017, her alleged onset date. (AR 17). At step two, the ALJ found that Dady had the following severe impairments: history of subarachnoid

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

hemorrhage from cerebral aneurysm treated by coiling, and suprasellar mass. (*Id.*). At step three, the ALJ concluded that Dady did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 20). Before proceeding to step four, the ALJ determined that Dady's symptom testimony, was "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 22). The ALJ assigned Dady the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; must avoid concentrated exposure to vibration; must avoid hazards such as unprotected heights, dangerous moving machinery, and driving a motor vehicle; cannot work in loud or very loud work environments.

(AR 20).

The ALJ determined at step four that given the foregoing RFC, Dady could perform her past relevant work of gas station cashier as generally performed, and prep cook as actually performed. (AR 25). Additionally, the ALJ found at step five that Dady could perform a significant number of other light-exertional unskilled jobs in the national economy, including retail marker, routing clerk, and dining room attendant. (AR 26). The ALJ concluded that even if Dady were further limited to sedentary work, she could still perform a significant number of unskilled jobs in the national economy, including document preparer, addresser, and call out operator. (*Id.*). Therefore, Dady's applications for DIB and SSI were denied. (AR 26-27).

### C. Symptom Testimony

When assessing Dady's symptom testimony, the ALJ found that Dady's statements about the severity of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 22). In doing so, the ALJ considered the objective medical

5

evidence; the medical source opinions; Dady's statements to providers; and her failure to comply with treatment based on her lack of participation in speech, occupational, and physical therapy, her inconsistency in taking prescribed medications, and that she did not quit smoking as counseled by her providers. (AR 18-24). Dady challenges the ALJ's basis for concluding that she did not comply with prescribed treatment, asserting that the ALJ improperly considered her lack of therapy participation, purported irregular use of medication, and tobacco habits. (ECF 18 at 21-24). The Court will discuss each of these arguments in turn.

1. Applicable Law

Under Social Security Ruling (SSR) 16-3p, "[i]n determining whether an individual is disabled, [the ALJ is to] consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." 2017 WL 5180304, at *2 (Oct. 25, 2017). An ALJ's consideration of a claimant's symptom testimony is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435. *See Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019) (If an ALJ's judgment of a claimant's credibility "was tied to evidence in the record and was not patently wrong, we may not disturb it." (citation omitted)); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's

6

consideration of a claimant's symptom testimony because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Having said that, an ALJ must base her credibility determination on "specific reasons supported by the record." *Richards v. Berryhill*, 743 F. App'x 26, 29 (7th Cir. 2018) (citation omitted). The regulations require the ALJ to analyze a variety of factors in making a determination of a claimant's subjective symptoms. These factors include: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medications; any additional treatments an individual receives for relief of symptoms; any non-treatment measures taken to relieve symptoms; and any other factors concerning an individual's functional limitations and restrictions due to symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8.

2. Failure to Attend Speech, Occupational, and Physical Therapy

Dady first asserts that the ALJ erred by failing to ask her about the possible reasons she did not attend speech, occupational, and physical therapy.[4] (ECF 18 at 21-23). In that regard, SSR 16-3p instructs:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's

---

[4] At the outset, Dady suggests that while she was "encouraged" to participate in speech, occupational, and physical therapy, she was not "specifically told to do to these therapies." (ECF 18 at 22 (citing AR 624 ("Encouraged follow up with OT/Speech/[g]rief counseling.")); *see also* AR 634-35 ("She was evaluated by PT/OT/speech who recommend outpatient therapy. . . . See OT for outpatient driving evaluation, outpatient speech therapy, neuro-psych testing.")). Dady's attempt to recharacterize her failure to participate in recommended therapies is a unavailing. Under SSR 16-3p, the ALJ must consider the treatment that a claimant has, *or has not*, participated in when assessing the severity of a claimant's symptom testimony. 2017 WL 5180304, at *8. Given the severity of the physical and cognitive limitations Dady claimed at the hearing, it was reasonable and logical for the ALJ to consider whether she had participated in rehabilitative therapies for the claimed limitations.

> symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

2017 WL 5180304, at *9.  Here, in the relevant part, the ALJ stated that:  "The claimant . . . failed to follow treatment recommended by her doctors, including speech/occupational therapy. She testified she had not engaged in physical therapy."  (AR 22 (citations omitted); *see also* AR 23 ("The claimant had not participated in speech/occupational therapy and had not followed up with a physician at IU Medical Center." (citations omitted))).

The ALJ's statement with respect to Dady's failure to attend therapies (and failure to see a consulting physician at IU Medical Center) accurately represents the record.  (*See, e.g.*, AR, 617, 624).  After Dady testified about problems with walking, the ALJ asked her if she had gone to physical therapy, to which Dady responded, "No."  (AR 43).  The ALJ then asked Dady whether she had health insurance during the relevant period, to which Dady responded affirmatively. (AR 45).  Thus, it is obvious that the ALJ considered at least one possible reason for Dady's failure to attend recommended therapies.  *See* SSR 16-3p, 2017 WL 5180304, at *9 ("An individual may not be able to afford treatment and may not have access to free or low-cost medical services.").

"Further, contrary to [Dady's] argument, [SSR] 16-3p did not require the ALJ to ask [her] about her failure to seek treatment.  That rule provides that an ALJ must *consider* possible reasons for a failure to seek treatment."  *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) (emphasis added).  Dady does not cite to any reason in the record why she did not attend therapies or see the physician at IU Medical Center, nor does she offer any reasons in her brief. (ECF 18 at 17-18); *Deborah M.*, 994 F.3d at 790 ("[N]or has [the claimant] identified any

8

specific reason that she did not seek more treatment.'). Consequently, the ALJ's reasoning based on Dady's failure to attend rehabilitative therapies and see a consulting physician is adequately supported.

    3. Medication Non-compliance

Next, Dady argues that the ALJ's statement that she was "inconsistent in taking medication" is not a fair characterization of the record. (*Id.* at 18-19). She points to two treatment notes that reflect she was indeed compliant with taking her medications. (ECF 18 at 22 (citing AR 625 ("She has been compliant with Vimpat."), 705 ("Patient takes medication as directed with no concern."))). She further asserts that the ALJ was unfair to discount her symptom testimony on this basis, given her domestic partner's testimony that he assists her with her medication and that she would not be able to take them independently without a timer because "she loses track of time." (ECF 18 at 23 (citing (AR 50)).

Yet, as the ALJ observed, there are other notes of record that reflect Dady does not always take her medications as prescribed. (AR 22; *see* AR 611 ("[Dady] is still taking Vimpat, but not consistently."), 722 ("Pt states she has not been taking any of the meds on her medication list since her hospital stay back in January.")). Thus, the evidence of record as to Dady's medication compliance is mixed. The ALJ, however, cited only the evidence supporting her conclusion that Dady "was inconsistent in taking medication" (AR 22) and ignored evidence to the contrary. As such, the ALJ "impermissibly cherry-picked" the record in an effort to support her conclusion. *Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018). This undercuts the ALJ's discounting of Dady's symptom testimony on the basis of non-compliance.

9

4. Failure to Quit Smoking

Dady also argues that the ALJ improperly used her failure to quit smoking when assessing her symptom testimony. (ECF 18 at 23-24). In that regard, the ALJ considered that Dady "continued to smoke cigarettes against her doctor's advice," and that "[h]er doctor explained that continued tobacco abuse increases the likelihood the aneurysm will recanalize over time, or new aneurysm could develop." (AR 22-23 (citing AR 495, 499, 533, 538-39, 548, 607, 610, 620, 624, 628, 677-78, 693, 697)).

In *Shramek v. Apfel*, the Seventh Circuit Court found that the ALJ had "misuse[d] . . . the non-compliance regulation" where the ALJ cited the claimant's "failure to quit smoking despite evidence that smoking could worsen the condition" as evidence of the claimant's "failure to comply with prescribed medical treatment." 226 F.3d 809, 812 (7th Cir. 2000) (citing 20 C.F.R. §§ 404.1530(a), 404.1530(b)). The Court explained that "[e]ssential to a denial of benefits pursuant to Section 404.1530 [and Section 416.930] is finding that if the claimant followed her prescribed treatment she could return to work." *Id.* (citing *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985)). The Court found that the ALJ "erred in relying on [the claimant's] failure to quit smoking as evidence of noncompliance and as a basis to find her incredible," where the ALJ "made no finding that the prescribed treatment would restore [the claimant's] ability to work . . . [and] no medical evidence directly linked her pain or swelling to her smoking." *Id.*

The instant circumstances are analogous to those in *Shramek*. While the record clearly evidences that Dady's medical providers repeatedly instructed her to quit smoking because "continued tobacco abuse increases the likelihood the aneurysm will recanalize over time, or new aneurysm could develop" (AR 533), there is no finding by the ALJ that smoking cessation

10

would actually restore Dady's ability to work. Rather, the instruction to quit smoking appears linked to prevention of another aneurysm or related medical conditions in the future. Dady's current symptoms and limitations stem from the aneurysm she already experienced in November 2017. Therefore, the ALJ improperly used Dady's failure to quit smoking as evidence of her failure to follow prescribed treatment when assessing the credibility of her symptom testimony. *See Shramek*, 226 F.3d at 813 ("[E]ven if medical evidence had established a link between smoking and [the claimant's] symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. . . . One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking— who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop.").

While an ALJ's reasoning need not be perfect, *see Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her decision to discount [the claimant's] credibility."); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"), two of the three pillars upon which the ALJ based her conclusion that Dady failed to comply with prescribed treatment are flawed, such that a remand of the ALJ's assessment of Dady's symptom testimony is necessary. In reaching this outcome, the Court notes several other flaws, as discussed *infra*, in the ALJ's assessment of Dady's symptom testimony, which further destabilizes the ALJ's conclusion and should be corrected upon remand.

5. <u>The State Agency Physicians' Opinions</u>

The ALJ also leaned upon the medical source opinions of the state agency reviewing doctors when assessing Dady's symptom testimony and crafting the RFC. (AR 24). In particular, the ALJ stated:

> State agency medical consultants determined the claimant can perform a range of light work with postural and environmental limitations (Exhibit 7A, 8A) . . . . The undersigned finds the State agency's assessment is persuasive and consistent with the overall evidence of record and accommodates the claimant's physical impairments that affect the brain and neurological function."

(*Id.*). Accordingly, the ALJ assigned Dady an RFC for light work with additional postural and environmental limitations. (AR 20).

But the ALJ mischaracterized the state agency physicians' opinions. These doctors found that Dady could stand or walk just *two* hours in an eight-hour workday (AR 122-26, 137-41), which is consistent with sedentary work. *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Light work, on the other hand, requires an individual be able to stand or walk for a total of *six* hours in an eight-hour workday. *Id.* at *6. Therefore, contrary to the ALJ's assertion, these medical source opinions undercut the ALJ's assessment when assessing Dady's symptom testimony and assigning an RFC that Dady was capable of performing light-exertional work. Accordingly, the ALJ should reexamine her analysis of these medical source opinions upon remand.

6. <u>Use of an Assistive Device</u>

Dady also alleges error with respect to the ALJ's consideration of her use of a wheelchair and walker. (*Id.* at 12-15). She acknowledges neither was prescribed, but contends that "'dizziness' has been noted at nearly all follow-up appointments" since her aneurysm in 2017,

12

and that her doctor told her that if she "need[s] the [wheelchair and walker], then [she] need[s] it." (ECF 18 at 13 (citing AR 46, 524, 572, 611, 617)).

In considering Dady's testimony that she uses a wheelchair or walker, the ALJ stated:

> The claimant was inconsistent in taking medication and failed to follow treatment recommended by her doctors, including speech/occupational therapy. She testified she has not engaged in physical therapy. . . . *While she testified she uses assistive devices such as a wheelchair and walker, they were not prescribed by a medical provider.* In addition, at times she denied symptoms such as dizziness, weakness, headaches, balance/gait issues, or visual disturbance. *Such evidence undermines allegations of disabling symptoms.*

(AR 22 (emphasis added) (citations omitted)). Dady cites *Parker v Astrue*, in which the ALJ discounted the claimant's credibility based on her use of a cane, finding "it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane." (ECF 18 at 12 (quoting *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010))). The Seventh Circuit, however, found that suspicion "absurd," given that "[a] cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist." *Parker*, 597 F.3d at 921. Here too, it appears that the ALJ improperly discounted (at least to some extent) Dady's testimony that she experiences occasional dizziness and uses a wheelchair or walker for the reason that these assistive devices were not prescribed by a physician.[5] Therefore, the ALJ's consideration of Dady's use of assistive devices in the context of the ALJ's consideration of Dady's symptom testimony should

---

[5] Having said that, "[t]he discussion in *Parker* about the use of a cane concerns an ALJ's credibilty determination, and it is inapplicable to the issue of whether a cane must be included as part of an RFC." *Collins v. Colvin*, No. 1:14-cv-00466-DML-JMS, 2015 WL 5775224, at *6 (S.D. Ind. Sept. 30, 2015). Thus, *Parker* does not "undermine the [Commissioner's] directive in SSR 96-9p; that the inclusion in an RFC of a claimant's need for a cane or other hand-held assistive device requires a finding of the necessity for the cane based on medical documentation of that need and the circumstances under which it is needed." *Id.* Here, as the ALJ correctly observed later in her decision, the record lacks documentation of medical necessity such that the wheelchair and walker must be included in the RFC. (*See* AR 22 ("[N]o treating clinician has indicated that she requires the use of an assistive device.")). It still appears, however, that the ALJ's consideration that the assistive devices were not prescribed may have improperly influenced her decision to discount Dady's symptom testimony.

also be revisited upon remand.

### D.  The RFC

Because the case will be remanded for the foregoing reasons, the Court need not reach Dady's remaining arguments challenging the RFC.  Nonetheless, one argument in particular will be briefly addressed so that the issue can be remedied upon remand.  Dady argues that the ALJ erred with respect to her frequent urination issues and back and neck pain by failing to find that they were "severe" impairments at step two. (ECF 18 at 15-16).  Presumably, Dady is suggesting that the ALJ failed to sufficiently account for these ailments in the RFC.

In her adult disability report, Dady specifically listed "INCONTINENCE" as a condition limiting her ability to work.  (AR 276).  During the hearing, she testified that she experienced incontinence "every week or two" that "[s]ometimes" necessitated a change of clothes.  (AR 47).  Urinary issues are also documented in the medical records, albeit infrequently.  (*See, e.g.*, AR 493, 573, 586, 722).

At step two, the ALJ found Dady's history of subarachnoid hemorrhage from cerebral aneurysm treated by coiling and suprasellar mass to be severe impairments, and that her hydrocephalus, reduction in visual field, and anxiety were non-severe impairments.  (AR 17-20).  The ALJ, however, did not address Dady's complaints of frequent urination or incontinence anywhere in her decision, aside from noting that at a follow-up appointment in January 2018 Dady denied experiencing any urinary frequency or incontinence.  (AR 23 (citing AR 493)).

The ALJ should have directly addressed Dady's complaints of frequent urination and incontinence—particularly given the VE's testimony that an employer would not tolerate an employee's unscheduled breaks. (AR 57); *see Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir.

14

2003) ("Incontinence constitutes an impairment under the Social Security Act that must be considered to determine whether an applicant is disabled. Evidence that Golembiewski's bladder impairment did not interfere with his work . . . would be a reason for the ALJ to discount the disabling nature of the problem, but it would not justify ignoring the problem entirely as the ALJ did here." (citation omitted)).

Consequently, the ALJ's failure to address Dady's urinary frequency and incontinence is an additional reason to remand the ALJ's decision. *See Verlee v. Astrue*, No. 1:12-CV-45-TLS-RBC, 2013 WL 1760810, at *5 (N.D. Ind. Apr. 24, 2013) ("The Court cannot excuse the ALJ's failure to consider the Plaintiff's . . . bladder dysfunction under the harmless error doctrine. . . . The Court is unable to determine with any confidence whether the agency will reinstate its decision on remand because the agency failed to provide any explanation or discussion of the Plaintiff's problems with urinary frequency . . . . Consequently, the Court has no place to start its review-any analysis of the agency's decision would require the Court to engage in an *ex post* rationalization of the agency's nonexistent discussion."). Upon remand, the ALJ should expressly consider Dady's claim of urinary frequency and incontinence.[6]

One final note. The ALJ is also encouraged upon remand to make clear whether she considered the possibility of any closed period of disability in the year following Dady's aneurysm in November 2017. *See, e.g.*, *Jackson v. Astrue*, No. 09 C 50028, 2010 WL 4793309, at *14 (N.D. Ill. Nov. 18, 2010) (remanding case where the ALJ failed to make clear in his decision whether he considered the possibility of a closed period of disability around the times

---

[6] Likewise, upon remand the ALJ should also address Dady's claim of back and neck pain, which were omitted from the decision as well.

that the claimant underwent her knee and back surgeries).

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is DIRECTED to enter a judgment in favor of Dady and against the Commissioner.

SO ORDERED.

Entered this 18th day of February 2022.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge